JUDGE CARTER



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

13 CV 0574

-----------------------------------------------------------------

M.L. and B.L., individually and on behalf of K.L.,

     Plaintiffs-Appellants,

  - against -        **COMPLAINT**

New York City Department of Education,

     Defendant-Appellee.

-----------------------------------------------------------------

   Plaintiffs, M.L. and B.L., individually and on behalf of K.L., by their attorneys, Mayerson & Associates, as and for their Complaint, allege and state the following:

   1.  Plaintiff K.L. is an eleven-year-old female child currently classified as having an eligible developmental disability – autism. K.L. also has diagnoses of verbal apraxia, a seizure disorder and acute sensitivity to environmental stimuli. K.L. is considered severely autistic with significant interfering behaviors. Plaintiffs M.L. and B.L. are K.L.'s parents.

   2.  K.L. was at all relevant times a student within the New York City Department of Education's purview, entitled to all rights, entitlements, and procedural safeguards mandated by applicable law, statutes and consent orders including, but not limited to, the Individuals with Disabilities Education Improvement Act (hereinafter "IDEA"), 20 U.S.C. § 1400 *et. seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education Law, and Part 200 of the Commissioner's Regulations.

   3.  Plaintiffs are residents of the State of New York, residing at all relevant times at an address within the New York City Department of Education's purview, and currently residing at an address within the Southern District of New York in Manhattan.

4.      Although well known to defendant, plaintiffs are not expressly named herein by their given names because of the privacy guarantees provided in the IDEA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. § 1232(g), and 34 C.F.R. § 99.

5.      Defendant, the New York City Department of Education, is a "local educational agency" and school district organized under the laws of the State of New York.   Both procedurally and substantively, defendant was and still is statutorily obligated under the IDEA, as well as the laws of the State of New York, to provide K.L. with a "free appropriate public education" ("FAPE").

6.      Pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. §1331 and §1367, this Court has jurisdiction of this action without regard to the amount in controversy.

7.      Venue is proper in that plaintiffs and defendant all reside or are situated within this judicial district.

8.      This action concerns K.L.'s 2011-2012 twelve-month school year, which commenced on July 1, 2011. The Impartial Hearing Officer ("IHO") held, in a well-reasoned and thorough decision, that defendant failed to provide K.L. with a FAPE for the 2011-2012 school year. (Exhibit A annexed hereto.)  By decision dated January 11, 2013, however, the State Review Officer ("SRO") reversed the IHO, largely by failing to ignore numerous statutory regulations that are designed to protect students with autism, like K.L.  (Exhibit B annexed hereto.)  The SRO, who herself failed – by 210 days – to comply with the 30-day statutory timeline for rendering a decision was beset with and insurmountable interest to "move" K.L.'s case along and ultimately find against K.L. in defendant's favor.

2

9.      On or about April 16, 2012, defendant prosecuted an appeal from the IHO's decision
to the SRO in order to seek reversal of the reimbursement relief for K.L.'s combination school-
based MCC and home-based ABA program.

10.     The SRO is racking up an unprecedented number of cases in which the SRO is
reversing IHO adjudications in favor of the student. The SRO is doing so by applying clearly
erroneous standards of review and by ignoring or failing to follow statutory and regulatory
mandates. Defendant appeals as many IHO losses as it does because it perceives that the SRO is
decidedly biased in favor of school districts and is prepared to recklessly ignore statutory
mandates, *controlling* federal case law, and other applicable standards and is willing to ignore
credibility findings and instead cherry-pick through the record and "consult" with the "expertise
of the education specialists who are part of the State Review Office" who "assist in rendering the
SRO's decisions." Such *"consultation"* outside of the record denies K.L.'s parents of their
fundamental right to due process and cross examination of these issues. Despite the mandate of
§ 279.12(a) of the Regulations ("the decision of the Sate Review Officer shall be based *solely*
upon the record before the State Review Officer"), the Office of State Review and defendant's
counsel proudly proclaim repeatedly that there are numerous "educational specialists" who are
not subject to cross examination, but who nevertheless "assist the SRO's in rendering their
decisions!"

11.     On December 5, 2012, our office wrote to the Office of State Review (Exhibit C
annexed hereto) to challenge the SRO's gross lateness in deciding 10 appeals where our office is
representing the student, including the instant matter. In contrast to the statutory 30-day decision
mandate, some of these decisions were supposed to have rendered by the SRO back in June and

July of 2012. In not one of these cases, including the instant matter, did we receive notification of extensions requested (or granted) that would explain this extreme level of lateness.

12.     In what represents the height of hypocrisy and capriciousness, the SRO has repeatedly taken strong measures against *hearing officers* whom the SRO has deemed untimely.[1]

13.     By letter dated December 18, 2012 (Exhibit D annexed hereto), the SRO, Justyn P. Bates, wrote back to us to apologize for the (admitted) lateness in our ten pending SRO matters, explaining "unfortunately, due to circumstances beyond my control as a State Review Officer, the Office of State Review has received an extraordinarily high influx of appeals." In the instant matter, SRO Stephanie Deyoe attached an "apology" letter to K.L.'s January 11, 2013 SRO Decision stating, "… I am rendering the decision today, January 11, 2013, 210 days late. I acknowledge that rendering the decision late is not compliant with federal requirements to issue a decision on a timely basis. I apologize for any inconvenience this may have caused the parties." (Exhibit E annexed hereto).

14.     The extraordinarily high influx of appeals is due to school districts that believe and perceive that the SRO's decision-making will normally favor the school district's position no matter what the result was below. Unfortunately, this perception also is what is driving so many parent appeals at the federal district court level, and a judiciary that is growing – rightfully so – increasingly frustrated by the SRO's conduct. *See B.R. v. New York City Dep't of Educ.*, 2012 U.S. Dist. LEXIS 182305 (S.D.N.Y. Dec. 26, 2012).

---

[1] The SRO has made findings of "misconduct" and "incompetence" against impartial hearing officers who allegedly did not properly "document" extensions of the 45-day timeline for the completion of the hearing and sought sanctions against those hearing officers. Appeals Nos. 11-136, 11-112, 11-091. The SRO even has referred a hearing officer to the Commissioner (presumably for discipline) for failing to "document" extensions of the 45-day timeline. Appeal No. 12-031. The SRO also has "cautioned" hearing officers for failing to "document" extensions or comply with timelines and "warned" hearing officers that hearings have taken too long. Appeals Nos. 11-155, 11-142, 11-136, 11-096, 11-037. The SRO also has "reminded" hearing officers of their obligations to comply with the 45-day deadline and "document" extensions. 11-150, 10-123, 10-106. The SRO's last such reported "reminder" came in September 2012, when the SRO had already gone off the cliff of untimeliness. Appeal No. 12-096. Apparently, all but the SRO must follow the timeline rules.

4

15.     An analysis of all the 2011-2012 reported SRO decisions (Exhibit F annexed hereto) bears this out. In cases where the school district won below, that result was rarely overturned or disturbed by the SRO. Yet, in more than **80%** of cases where the student had won below and where the **school district** was the appealing party, the SRO reversed the hearing officer's award in order to rule for the school district. This disparity explains why school districts, including New York City's DOE, are appealing to the SRO at record levels. The SRO has created a clear incentive for this "high influx."

16.     A State Review Office that cannot or will not comply with basic statutory "timeline" mandates (but which apparently has no difficulty sanctioning, chastising or disciplining hearing officers for *their* alleged timeline issues) has a material conflict of interest that precludes the SRO from properly adjudicating and enforcing all the other FAPE "compliance" issues and claims that arise in these kinds of appeals. The operations of the SRO are organized as to constitute a deprivation of due process.[2]

17.     Unsurprisingly, the SRO's decision dated January 11, 2013 completely reversed the IHO's decision. The SRO's Decision failed to take into consideration and/or give appropriate weight to the legal and factual circumstances of K.L.'s case or the decision of the IHO.

18.     This action presents an appeal from the SRO's Decision. The SRO's Decision is erroneous and contrary to law and statute as an arbitrary result that goes against the clear weight of the evidence, statutory mandates, and the review standards set forth by the Second Circuit. This Court, pursuant to the IDEA, 20 U.S.C. § 1415, has broad remedial powers to take appropriate action.

---

[2] The SRO, in her decision, states that the "only discernable reason raised by [plaintiffs on the issue of bias] is that upon judicial review, federal district courts have from time to time disagreed with and reversed the merits of several decisions issued by another adjudicator ... I have considered the parents' request and find that I am able to impartially render a decision and that there is no bases for recusal in this instance." Ex. B at 6. The SRO even misconstrues our bias claim.

19.    Just as Judge Rakoff recently held in the *B.R.* case, here too the SRO's cursory

conclusions about defendant's proposed program and placement utterly fail to meet the *M.H.*

standard. Thus this Court should apply a pure *de novo* standard and the SRO's decision-making

is not entitled to much, if any, "deference" as a matter of law.

20.    Judge Rakoff analyzed the district court's standard of review.

> The standard of review on such an appeal is somewhat Janus-like. On the one
> hand, the IDEA requires this Court to "conduct[] an 'independent review of the
> administrative record' and . . . make[] a determination based on a 'preponderance
> of the evidence.'" *W.M. v. Lakeland Cent. Sch. Dist.,* 783 F. Supp. 2d 497, 504
> (S.D.N.Y. 2011) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105,
> 112 (2d Cir. 2007)). On the other hand, the Supreme Court has held that such a
> review is "by no means an invitation to the courts to substitute their own notions
> of sound educational policy for those of the school authorities which they
> review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S.
> 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). The Second Circuit, however,
> has recently clarified how this somewhat uncertain standard should be applied in
> cases, such as this one, where the SRO has reversed the IHO and the matter then
> comes before a court. *See M.H. v. N.Y.C. Dep't of Educ. (M.H. II),* 685 F.3d 217
> (2d Cir. 2012). In such a situation, the court should give substantial deference to
> the SRO's views of educational policy, but less to the SRO's factual findings or to
> its reasoning in general. *Id.* at 241. Thus, the Court must determine whether the
> SRO's decision is "well-reasoned, and whether it was based on substantially
> greater familiarity with the evidence and the witnesses than the reviewing court."
> *Id.* at 244 (citing *Lenn v. Portland Sch. Comm.,* 998 F.2d 1083, 1086-87 (1st Cir.
> 1993)); *see also R.E.,* 694 F.3d 167, 2012 WL 4125833, at *16 ("[A] court must
> defer to the SRO's decision on matters requiring educational expertise unless it
> concludes that the decision was inadequately reasoned, in which case a better-
> reasoned IHO opinion may be considered instead."). *B.R.,* 2012 U.S. Dist. LEXIS
> 182305 at *10-11.

21.    On this appeal, which is in the nature of a modified *de novo* review, this Court should

independently review the record. Where, as here, the underlying decisions that are being

appealed are not supported by the existing record, or are expressly erroneous, the reviewing court

need not accord much weight to the administrative fact-findings. *See Evans v. Bd. of Educ.*, 930

F. Supp. 83, 93 (S.D.N.Y. 1996). We urge that the case is even more compelling where, as here,

there is demonstrable evidence of actual bias, conflict of interest, and a lack of impartiality on

the part of the SRO in cases of this type. Accordingly, this Court should defer to and adopt the IHO's well-reasoned conclusions based on the exhibits and testimony. *M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 161 (S.D.N.Y. 2010), *aff'd*, 685 F.3d 217 (2d Cir. 2012) (rejecting the SRO's conclusion as insufficiently reasoned and deferring to IHO's conclusion that 6:1:1 placement "could not provide the 1:1 [placement] that constituted an appropriate education for P.H.").

22.  The Second Circuit has further held, in *R.E.*, "the deference owed to an SRO's decision depends on the *quality* of that opinion." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (emphasis added).

23.  In light of the IHO's credibility assessments, the defendant's violation of multiple statutory mandates, and the IEP documents that were demonstrably deficient on their face (*e.g.*, no real 1:1 teaching, no mandatory parent training, no FBA, no adequate BIP, no transition plan, no after-school services), we urge this Court to follow the approach and reasoning of the district court in *M.V.* That is because, "absent clearly erroneous reasoning, it is not this Court's place to reconsider the factual determinations of the IHO, who herself observed the witnesses' testimony, made credibility judgments, and applied her educational expertise in rendering her decision." *M.H.*, 712 F. Supp. 2d at 155.

24.  As the Second Circuit explained in *M.H.*:

> Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. The district court's decision to disagree with the SRO was proper ... The court assessed whether the SRO's conclusions were grounded in a "thorough and careful" analysis. The court rejected them ... when it found that they were not supported by a preponderance of objective evidence.

*M.H. v. N.Y.C. Dep't of Educ. (M.H. II)*, 685 F.3d 217, 244 (2d Cir. 2012). We urge that the SRO's conclusions here, however, were not grounded in a "thorough and careful analysis," as

the SRO ignored the testimony of the eight witnesses[3] who, in great detail, described K.L.'s myriad and severe deficits and intensive needs that could not be met in the DOE's recommended program and placement and that even required intervention beyond the school day. *See Evans v. Bd. of Educ.*, 930 F.Supp. 83, 93 (S.D.N.Y. 1996). On this record, the district court should not defer to the SRO's Decision which contains no meaningful analysis of the evidence in the underlying record.

25.    This action is brought pursuant to the provisions of 20 U.S.C. § 1400, *et. seq.*, more commonly known as the IDEA and, in particular, 20 U.S.C. § 1415(i)(2)(A), in order to seek:

(a)    a modified *de novo* review and reversal of the SRO's January 11, 2013 Decision (Ex. B) following an independent review and consideration of the underlying administrative record and any "additional evidence" that may be appropriate for this Court to consider, and reinstatement of the Impartial Hearing Officer's March 13, 2012 "Findings of Fact and Decision" (Ex. A);[4]

(b)    a determination that defendant failed to meet its burden on Prong I and it failed to provide plaintiff with a FAPE;

(c)    a determination that plaintiffs met their burden in establishing that K.L.'s individualized placement and program at the Manhattan Children's Center ("MCC") coupled with her home-based program, was reasonably calculated to provide a meaningful educational benefit;

(d)    a determination as to Prong III, that the IHO properly found that the equities favor K.L. and her parents;

---

[3] Two of K.L.'s eight witnesses are highly qualified autism experts and Board Certified Behavior Analysts ("BCBA"), whose testimony was not rebutted. *See* Ex. A at 9, stating one of the witnesses was qualified as an expert in autism at the hearing.

[4] The March 13, 2012 Decision was "corrected" on April 9, 2012 with respect to the "Evidence List" at the end of the Decision. To ensure that the record is clear, we are attaching the April 9, 2012 decision as Exhibit A.

(e)     an order granting plaintiffs leave to file a fee application pursuant to the fee-shifting provisions of the IDEA.

26.     The FAPE required under IDEA necessarily will be different for each child, as IDEA expressly rejects any "one size fits all" approach or restrictions that preclude the genuine individualization of a student's educational program.  The underlying administrative "due process" proceeding was brought by plaintiffs pursuant to the IDEA to secure K.L.'s pendency entitlements, declaratory and reimbursement funding relief pertaining to K.L.'s core placement and program at MCC and her home-based 1:1 ABA program, for the twelve-month 2011-2012 school year, upon proper notice duly given by plaintiffs pursuant to the requirements of the IDEA.

27.     On or about March 15, 2011, defendant DOE convened an IEP (Individualized Education Program) meeting for the ostensible purpose of developing an IEP for K.L. for the 2011-2012 school year.

28.     On or about June 30, 2011, plaintiffs, through their counsel, Mayerson & Associates, filed a demand for due process, asserting a variety of procedural and substantive challenges to the March 15, 2011 IEP and the DOE's proposed placement.  K.L.'s claims were based on defendant's procedural and substantive failures to provide K.L. with a FAPE (Prong I), the fact that the combination of K.L.'s private school placement and after-school supports and program were "reasonably calculated" to provide K.L. with a meaningful educational benefit (Prong II), and the absence of any "equitable considerations" that would preclude or diminish a reimbursement award (Prong III).[5]

---

[5] Reference is made to the three-prong test established by the U.S. Supreme Court in *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985) and *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).  *See also Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982).

29.     On or about July 7, 2011, plaintiffs amended their demand for due process and made

further allegations regarding defendant's proposed program and placement including, but not

limited to the following:

- ✓ The DOE's proposed program is not "reasonably calculated" to provide [K.L.] with a FAPE;

- ✓ The DOE failed to timely develop critical *assessment* reports that should have been used as the basis for establishing "present levels" as part of the fundamental development of the IEP, including but not limited to a meaningful base-lining of [K.L.]'s then-existing functional and skill levels, including but not limited to her interfering behaviors – this failure helped to prevent the IEP documents from being "reasonably calculated";

- ✓ The IEP team was not duly constituted;

- ✓ Despite noting at IEP page 5.1 that: "[K.L.] has difficulty navigating her environment," the IEP fails to even offer adaptive physical education or note the limited time [K.L.] can participate in activities, such as gym, and walking up and down the stairs;

- ✓ The DOE failed to meet the New York State and Federal mandates that "provision" be expressly made in [K.L.]'s IEP for individualized parent counseling and training as a related service for students who have been diagnosed on the autism spectrum (8 NYCRR §200.13 and 34 C.F.R. §300.34(c)(8));

- ✓ The DOE failed to develop an appropriate Functional Behavior Assessment ("FBA"), if at all, despite [K.L.]'s interfering behaviors;

- ✓ The DOE failed to develop an appropriate Behavior Intervention Plan ("BIP"), if at all, despite [K.L.]'s interfering behaviors;

- ✓ Despite the presence of interfering behaviors, the proposed IEP lacks adequate goals and objectives adequate, if at all, to address and remediate [K.L.]'s varied and serious behaviors;

- ✓ The DOE failed to ever conduct a triennial evaluation;

- ✓ Upon information and belief, the recommended placement was not ready, wiling and able to fulfill [K.L.]'s IEP service mandates by trained and properly supervised personnel, and this goes to the "reasonably calculated" issue because the DOE knew or should have known of the recommended school's history of problems fulfilling IEP mandates and services;

✓ Upon information and belief, the proposed placement is not ready, willing and able to properly implement the DOE's proposed behavior plan; the DOE recommended placement at a school with numerous open exits, gates and lax security;

✓ The DOE failed to meaningfully consider [K.L.]'s private evaluations and take them into account;

✓ The DOE engaged in impermissible "predetermination" in the IEP development process, precluding any meaningful participation from [K.L.]'s parents and/or other team members;

✓ The DOE failed to develop an IEP tailored to [K.L.]'s individual and unique needs, and instead, adhered to DOE policy, custom and/or practices;

✓ The DOE failed to indicate objective "Methods of Measurement" for any goals, relying unduly on "observation," while other goals have no methodology for measuring progress toward goals;

✓ Although IEP goals are labeled as "short term" objectives, the IEP does not specify the length of the "term" and thus, there are no intermediate points built in the IEP to assess and measure [K.L.]'s progress;

✓ The DOE failed to develop IEP goals that were clear, unambiguous, adequate, sufficiently challenging, and individualized for [K.L.];

✓ The DOE failed to develop adequate IEP short-term objectives with respect to the each listed goal. This makes it difficult, if not impossible, for anyone reading [K.L.]'s IEP to determine how each goal can be incrementally met over time;

✓ The DOE failed to offer adequate levels and frequencies of related services;

✓ The DOE failed to provide the requisite consistency in programming;

✓ Whereas [K.L.] has difficulty with generalization, the DOE failed to properly promote generalization;

✓ The DOE failed to provide [K.L.] with the opportunity to generalize skills by working with multiple individuals. The 1:1 paraprofessional assigned to [K.L.] prevents independence and precludes generalization across different people and different environments and promotes dependency;

✓ The DOE failed to provide [K.L.] with consistent 1:1 *teaching* support throughout the school day;

✓ The DOE failed to adequately consider [K.L.]'s need for consistency in her program given her transition and generalization deficits – *no transition plan*, appropriate or otherwise, was discussed, recommended or developed by the DOE;

✓ The DOE failed to meaningfully include [K.L.]'s parents in the IEP development and placement selection process, as required by statute and *Winkelman v. Parma City Sch. Dist.*, 127 U.S. 1994 (2007);

✓ The DOE's proposed IEP for 2011-2012 is sufficiently similar to its previous IEP that was already adjudicated as failing to provide a FAPE;

✓ The DOE failed to have any meaningful discussion about classroom observations, much less actually conduct one;

✓ The DOE failed to provide a copy of the IEP to [K.L.]'s parents at the end of the IEP meeting;

✓ The DOE incorporated goals and objectives developed by Manhattan Children's Center which reference a specific methodology (e.g. "learn units") that the proposed placement and its personnel are not ready, willing and able to implement;

✓ The DOE failed to give meaningful consideration to the need for "assistive technology";

✓ The DOE failed to follow the Commissioner's Regulations and its own policy regarding administering Functional Behavioral Assessments, including 8 NYCRR §200.1(r), 200.5(b)(1), 200.22(a) and 201.3;

✓ The DOE's so-called "Behavior Intervention Plan" fails to meet the Commissioner's Regulations (8 NYCRR §§200.1(mmm), 200.22(b), 201.2(a)) and the DOE's own policy and procedure for creating BIPs for students with disabilities;

✓ The DOE recommends a program and placement that in whole or in part utilizes TEACCH based program and student was not adequately assessed for her amenability to the TEACCH methodology;

✓ The DOE's own document illustrates that TEACCH program is not appropriate to this student;

✓ The DOE failed to properly support existing "assistive technology";

✓ The IEP team failed to assess and/or otherwise meaningfully consider what, if any, educational methodologies and approaches are "reasonably calculated" to promote [K.L.]'s meaningful educational progress;

✓ The IEP team failed to select or identify any core educational methodology, much less one that would be "reasonably calculated" to be effective for [K.L.];

✓ The core "methodology" employed at the DOE's proposed placement is inappropriate and inadequate to meet [K.L.]'s needs;

✓ The DOE failed to recommend any special education transportation for [K.L.] – appropriate or otherwise;

✓ Despite noting that [K.L.] has significant choking behavior, the DOE failed to propose any adequate goals to address this life-threatening behavior;

✓ At the IEP meeting, [K.L.]'s mother told the IEP team that [K.L.] suffers from seizures but the DOE failed to note this as an "alert" on her IEP;

✓ The DOE's recommended placement is not reasonably calculated to provide [K.L.] with meaningful educational benefit;

✓ Contrary to statute (8 N.Y.C.R.R. § 200.4(2)(d)(2)(xii)) and *Winkelman*, the DOE failed to discuss, develop, recommend or offer a specific placement location at [K.L.]'s IEP meeting or afterwards with a meeting attended by a placement officer, stating instead "special class in a specialized school," which is not an actual placement location, but an impermissible abdication and delegation of the IEP development and placement situs selection function;

✓ The DOE's proposed placement cannot adequately fulfill [K.L.]'s related service mandates;

✓ The proposed IEP program and placement ostensibly would start on July 1, but involved a placement and personnel that would materially change, once again, as of September;

✓ [K.L.] will not only need to switch schools in September, but also class-size ratio;

✓ The students in the proposed classroom are grouped primarily by age and not by functioning level and/or their classifications;

✓ The proposed IEP program and placement, as written, is calculated to (a) produce regression and (b) work against independence and self-sufficiency;

✓ The proposed placement presents an unsafe environment for [K.L.];

✓ The proposed IEP program failed to list the projected date of its initiation;

✓ The DOE failed to timely offer a placement recommendation – appropriate or otherwise – for [K.L.];

✓ The DOE's recommended program and placement was and is not "reasonably calculated" to provide [K.L.] with a meaningful educational benefit;

✓ To the extent that the DOE has failed or continues to fail to adequately provide [K.L.] with [K.L.]'s statutory pendency entitlements, [K.L.]'s parents seek an award of compensatory education for all unfulfilled pendency services.

30.     The IHO, James McKeever, Esq. considered the "cumulative impact"[6] of multiple

violations and held:

✓ The Student has an adverse response to new environments, which causes her to act aggressively. The Student also has difficulty navigating her environment, particularly stairs and needs to be monitored at all times. The Student's speech is limited to utterances that are generally only understood by persons who know the Student well. Ex. A at 5.

✓ The Student exhibits significant delays in academic literacy and presently uses pictures for object and word identification. The student uses an iPad with the Proloquo2go program, purchased by her parents, which has enhanced her communication skills to the extent that she can now begin a sentence with "I want" and she can navigate the iPad to general a simple sentence. The Student also has limited Sign Language abilities, however, the iPad is the Student's main mode of communication. Ex. A at 5.

✓ The Student requires consistent and frequent intervention in order to modify her behavior and reach a regulated state, which in turn will make her available to attain new skills. Ex. A at 6.

✓ With respect to social/emotional functioning, the Student "swats" and "smacks" adults and her peers to communicate her displeasure with a particular activity. The Student also spits and shreds her clothing when she is unregulated. When the Student shreds her clothing, she eats the string, which has cause choking episodes and gastrointestinal issues that have significant endangered the Student's health. Ex. A at 5-6

✓ The Student's social emotional functioning, which is significantly delayed, is compounded by her approach to puberty. Additionally, although 11 years old, the

---

[6] *See R.E.*, 694 F.3d at 191; *P.K. v. N.Y.C. Dep't of Educ.*, No. 09-1472, 2011 U.S. Dist. LEXIS 90462 (E.D.N.Y. Mar. 17, 2011) (Magistrate's Report), *adopted*, No. 09-1472, 2011 U.S. Dist. Lexis 90534 (E.D.N.Y. Aug. 11, 2011), *argued*, No. 11-3525 (2d Cir. Oct. 24, 2012).

Student is not completely toilet trained. At home, the Student is unable to take a shower without assistance. Ex. A at 6

✓ The Committee on Special Education (CSE) did not consider a home based program and individual parent training was not listed on the Student's IEP. Ex. A at 7.

✓ The IEP does not provide goals for the Student's use of the iPad. Ex. A at 7.

✓ The DOE issued an FNR [Final Notice of Recommendation] dated June 10, 2011 for placement at PS 94. However, the Student would [have] only attended a summer program at PS 94 for approximately six weeks. Thereafter, in the fall of 2011, the Student would have been moved to P188. The classroom teacher was not trained in Applied Behavior Analysis (ABA) and she did not know anything about the "TEACCH" methodology. Ex. A at 7.

✓ It is very difficult for the Student to make transitions. The CSE did not develop any "transition plan" for the Student to move from MCC to PS 94. Ex. A at 7.

✓ The DOE did not present any evidence at the impartial hearing with respect to the Student's placement at P188 and/or with respect to the implementation of the Student's IEP at P188. Ex. A at 7.

✓ On June 27, 2011, the parent advised the DOE, in writing, that she rejected the recommended placement for a number of reasons and asked the DOE to recommend another school. The DOE failed to respond to the parent's letter. Ex. A at 7.

✓ In this case, the evidence shows that the DOE failed to meet their burden of proof with respect to demonstrating by a preponderance of evidence that the Student was offered a FAPE for the 2011-2012 school year. Ex. A at 10.

✓ ... [A]ssuming, *arguendo*, that the recommended placement for the Student in a 6:1: class was appropriate, the DOE failed to offer any evidence at the impartial hearing to demonstrate that the program at P188, which is where the Student would attend for the majority of the school year, was appropriate for the Student. Ex. A at 10.

✓ I find the DOE failed to meet its burden of proof with respect to demonstrating by a preponderance of evidence that the Student was offered a FAPE for the 2011-2012 school year. Ex. A at 10.

✓ I also find that the Student was denied a FAPE for the subject school year because the CSE's recommended placement in a 6:1:1 class with a full time behavior paraprofessional and related services in a 12 month program was insufficient to me[e]t the Student's needs and because it was not reasonably calculated to offer the Student an educational benefit. Ex. A at 10-11.

✓ The evidence shows that the Student requires consistent and frequent 1:1 interventions, such as ABA (or some other research based behavior therapy), in order to modify her behavior to make her available to attain new skills. Ex. A at 11.

✓ Although the DOE's recommended placement included a head teacher, a classroom paraprofessional and a 1:1 behavior paraprofessional, the evidence shows that the 1:1 instruction in the DOE's placement was limited to approximately one and a half hours per day, which I find is insufficient to meet the Student's needs. Ex. A at 11.

✓ I find that the DOE's proposed class was not structured enough for the Student to obtain an educational benefit. Ex. A at 11.

✓ With respect to social/emotional functioning, the evidence shows that the Student is physically aggressive to adults and her peers and that the Student ingests inedible objects which has cause choking episodes and gastrointestinal issues that have endangered her health. Ex. A at 11.

✓ Additionally, the evidence shows that the Student's social emotional functioning is compounded by her approach to puberty and that although 11 years old, the Student is not completely toilet trained and she cannot take a shower without assistance. Ex. A at 11.

✓ Significantly, and contrary to the DOE's assertions, no evidence was presented to demonstrate that the recommended placement was equipped to address these needs. Ex. A at 11.

✓ Moreover, although the DOE prepared a BIP, the evidence shows that the proposed BIP did not address the Student's toileting needs or the Student's needs related to puberty. Ex. A at 11.

✓ I find that the location of the Student's classroom on the 4th floor of the school building (PS94), which does not have an elevator, was inappropriate for the Student ... [T]he Student has difficulty navigating her environment, particularly stairs, and needs to be monitored at all times. Ex. A at 11.

✓ Although the DOE offered a full-time behavior paraprofessional, the proposed location of services, which would compel the Student to climb several flights of stairs, several times a day, was not tailored to meet the Student's individual needs. Ex. A at 11-12.

✓ I find that the CSE's refusal to consider a home-based program, which the Student has had for several years and which the evidence shows that the Student would regress without it, was inappropriate to meet the Student's needs. Ex. A at 12.

✓ I also find that the CSE's failure to provide individualized parent training on the Student's IEP was inappropriate and contributed to the denial of FAPE. Ex. A at 12.

✓ I find that the failure of the CSE to develop a "transition plan" for the Student to move from MCC to PS94 also contributed to a denial of FAPE. Ex. A at 12.

31.     By reason of the evidentiary record and plaintiffs' pleaded claims, the IHO could and

should have made *additional* Prong I findings against defendant, and plaintiffs properly raised

this issue during defendant's appeal to the SRO.

32.     As to Prong II and III, the IHO made the following findings:

✓ I find that the evidence presented at the impartial hearing demonstrated that the parents' placement at MCC and the Student's home-based program were appropriate ... The evidence shows that the Student is receiving appropriate behavioral interventions at MCC and in the home, which are tailored to meet the Student's individual needs and have enabled the Student to obtain an educational benefit. Ex. A at 14.

✓ Specifically MCC is an ABA program where students receive 1:1 instruction throughout the day. The Student's lead classroom teacher is a licensed special education teacher as well as a BCBA. Ex A at 14.

✓ MCC provides direct reinforcement to the Student when she behaves appropriately and data is collected on the Student's behaviors on a daily basis, which is then analyzed to develop reinforcing and modification strategies in order to diminish the interfering behaviors. Significantly, the evidence shows that the interventions employed at MCC have helped diminish the Student's shredding, hitting and biting behaviors. Ex. A at 14.

✓ The Student's home-based program is necessary for the Student to learn how to generalize the skills obtained at school to the home environment. The home-based program is also necessary for the Student to develop self-care skills and learn how to engage in leisure activities. The home-based program is tied into the school-based program because the Student requires continuous repetition throughout the entire day, not just the school day, to acquire new skills and modify her behavior. Without continuity of the school-based and home-based programs, the Student would regress and become disregulated. Ex. A at 14-15.

✓ The level of services provided to the Student permits the Student to remain home with her parents and siblings, which is less restrictive than a residential setting. Ex. A at 15.

✓ The evidence shows that the Student is making progress with the support of her school-based program and her home-based program. Ex. A at 15.

✓ I find that the parents' unilaterally placement of the Student at MCC with the home-based program is appropriate to meet the Student's identified special education needs and has provided her with the opportunity to receive educational benefits. Ex. A at 15.

✓ Nothing in the record suggest that the parents failed to cooperate with the CSE. To the contrary, the evidence shows that the parents worked collaboratively with the CSE in order to obtain an appropriate IEP and placement for the Student. Additionally, the evidence demonstrates that the parents provided the DOE with the requisite notice of the students' removal from public school prior to the student's placement at MCC. Ex. A at 15.

✓ The parents' request for tuition reimbursement for payments made to the MCC and for all payments made for the Student's home-based program during the 2011-2012 school year is granted. Ex. A at 15.

33.     The IHO also made specific credibility findings in favor of K.L.'s witnesses and against defendant's witnesses:

✓ I find that all of the witnesses who appeared at the impartial hearing testified in a credible manner. However, I do not credit the testimony of the DOE's witnesses with respect to the appropriateness of the CSE's recommended program for the Student." Ex. A at 9.

34.     Furthermore, in their June 30, 2011 filing, plaintiffs invoked K.L.'s automatic and unconditional "pendency" entitlements, which were based upon a previous final and non-appealable June 8, 2009 decision of Impartial Hearing Officer Sharyn Finkelstein in plaintiffs' favor. (Exhibit G annexed hereto.) That decision awarded K.L.: (a) twenty hours per week of home-based ABA (SEIT) therapy; (b) four hours per week of occupational therapy; and (c) transportation to and from school (not to exceed thirty minutes each way), all as part of a twelve-month school year. On September 27, 2011, IHO James McKeever Esq. issued an "Order on Pendency" awarding plaintiffs these pendency services (Exhibit H annexed hereto). We are hereby invoking plaintiffs' continued pendency rights under that Order, as per 20 U.S.C. §1415(j).

35.     On timely notice to defendant, plaintiffs continued K.L.'s placement at the not-for-profit Manhattan Children's Center. MCC is a 1:1 ABA teaching school that provides intensive services for children with autism spectrum disorders. These services include intensive 1:1 ABA teaching, 1:1 speech and language therapy, and 1:1 occupational therapy. K.L.'s after-school 1:1

18

ABA teaching program provides her with the support necessary to keep her in her least restrictive environment (LRE) and prevent regression. K.L.'s core placement at the MCC, coupled with her home-based ABA services, was "reasonably calculated" and necessary for K.L. to make meaningful educational progress. *Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982). The burden that parents must meet to satisfy the applicable Prong II standard is somewhat less stringent than the Prong I standard to which a school district must adhere in offering a child a FAPE. *See R.E.*, 694 F.3d 167.

36.     The evidence adduced during the administrative hearing amply establishes, consistent with the facts alleged in plaintiffs' demand for due process, that defendant committed *numerous* substantive and procedural violations that collectively deprived K.L. of a FAPE. The "cumulative effect" of these and other violations discussed infra combined to deprive K.L. of a FAPE. *See R.E.*, 694 F.3d at 191; *see also P.K.*, 2011 U.S. Dist. LEXIS 90462.

37.     The Second Circuit held in *R.E.*, 694 F.3d 167, that the IEP's adequacy is something to be assessed "prospectively," and not by reliance on defendant's convenient, "retrospective" testimony as to what it allegedly "would have" done for the student despite what the IEP says or fails to say. Testimony at a hearing that claims additional services or modification that "could have been" or "would have been" available despite what the IEP says is neither sufficient nor permissible to cure IEP failures and omissions. *See R.E.*, 694 F.3d at 186 ("[w]e now adopt the majority view that the IEP must be evaluated prospectively as of the time of its drafting and therefore hold that retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered in a Burlington/Carter proceeding"). "Testimony may not support a modification that is materially different from the

IEP, and thus a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP." *R.E.*, 694 F.3d at 185.

38.     The IHO's "Findings of Fact and Decision" dated March 13, 2012, correctly granted plaintiffs full funding relief at the not-for-profit MCC and ongoing funding for K.L.'s home-based program.

39.     The record below not only supported the contention that K.L.'s core placement at MCC coupled with after-school 1:1 ABA teaching was "reasonably calculated" to provide her with meaningful educational benefits, but it showed that it was a necessary component without which K.L. would regress.

40.     Plaintiffs have exhausted their administrative remedies.

WHEREFORE, it is respectfully submitted that this Court, while maintaining K.L.'s existing pendency entitlements, upon its modified *de novo* review, should:

(a)     reverse the January 11, 2013 Decision of the SRO;

(b)     reinstate the March 13, 2012 "Findings of Fact and Decision" of the IHO;

(c)     declare, consistent with the IHO's findings, that defendant failed to offer K.L. a FAPE for the twelve-month 2011-2012 school year (Prong I);

(d)     declare, consistent with the IHO's findings that plaintiffs' core placement at the MCC coupled with her after-school 1:1 ABA teaching support and other related services was "reasonably calculated" to provide K.L. with meaningful educational benefits in accordance with the applicable Second Circuit standards (Prong II);

(e)     declare, consistent with the IHO's findings, that the equities favor the plaintiffs (Prong III);

(f)     declare plaintiffs to be the "substantially prevailing" parties;

(g)    grant leave to plaintiffs to submit a fee application for purposes of statutory attorneys' fees and other recoverable costs, both at the administrative level and for this action, pursuant to the express fee-shifting provisions of the federal IDEA statute; and

(h)    grant plaintiffs such other, further and different relief as may be just under the circumstances.

Dated:    January 25, 2013
        New York, New York

Gary S. Mayerson (GSM 8413)
Tracey Spencer Walsh (TW 2746)
Maria McGinley (MM 9438)
Mayerson & Associates
*Attorneys for Plaintiffs*
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200, (212) 265-1735 (facsimile)
gary@mayerslaw.com
www.mayerslaw.com