**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

M.L. and B.L., individually and on behalf of    :
the student,    :
   :
                  **Plaintiffs,**    :     **1:13-cv-00574 (ALC) (JLC)**
   :
      -against-    :     <u>**OPINION AND ORDER**</u>
   :
NEW YORK CITY DEPARTMENT OF    :
EDUCATION,    :
   :
                **Defendant.**    :
-------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

      Plaintiffs M.L. and B.L. (collectively "Plaintiffs" or "Parents") bring this action against the

New York City Department of Education ("DOE") under the Individuals with Disabilities

Education Act, 20 U.S.C. § 1400 <u>et seq.</u> (2006) ("IDEA").   They challenge the DOE's

educational placement of their daughter, K.L., as both procedurally and substantively inadequate

and seek reimbursement of her private school tuition.   The parties have completed a state

administrative hearing and an administrative appeal, and Plaintiffs now seek review of those

proceedings in this Court.   The parties have filed cross-motions for summary judgment,

supplementing the record produced in the state administrative proceedings with additional

evidence.   For the reasons set forth below, the DOE's motion is GRANTED, (ECF No. 27), and

Plaintiffs' motion is DENIED.   (ECF No. 18).

**I.**     **The IDEA Framework**

      Pursuant to the IDEA, New York State is required to "provide disabled children with a free

and appropriate public education ["FAPE"]."  <u>M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.</u>, 725

F.3d 131, 135 (2d Cir. 2013) (internal quotation marks and citations omitted).   The DOE ensures

that a disabled child is given a FAPE by creating an individualized education plan ("IEP") for the child.  R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012).  "An IEP is a written statement that 'describes the specially designed instruction and services that will enable the child to meet stated educational objectives and is reasonably calculated to give educational benefits to the child.'"  Scott ex rel. C.S. v. N.Y.C. Dep't of Educ., No. 12 Civ. 3558 (AT), 2014 WL 122529, at *1 (S.D.N.Y. Mar. 25, 2014) (quoting M.W., 725 F.3d at 135).

A Committee on Special Education ("Committee") is convened to develop an IEP for a child.  N.Y. Educ. Law § 4402(1)(b)(1) (2013).  The Committee "examine[s] the student's level of achievement and specific needs and determine[s] an appropriate educational program." R.E., 695 F.3d at 175 (citing Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107–08 (2d Cir. 2007)).  The Committee "does not select the specific school where the student will be placed; accordingly, the IEP does not specify a particular school site."  Scott, 2014 WL 122529, at *1 (citations omitted).  The IEP only lists general placement information, like the classroom ratio and any related services to be provided, and the DOE later follows up with a final notice of recommendation ("FNR") identifying the school site.  R.E., 694 F.3d at 191.  The DOE must offer a placement that conforms to the program in the student's IEP.  Id.  It need not consult with the parents before selecting the site; but the parents may visit the site before deciding whether to accept it.  Id. at 191-92.

Should parents believe that the DOE has not provided their child with a FAPE, they may unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement."  M.W., 725 F.3d at 135 (citing Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 9–10, 16 (1993)).  To seek tuition reimbursement, the parent first files a due process complaint with the DOE.  Scott, 2014 WL 1225529, at *2.  "The due process complaint initiates

administrative proceedings involving an impartial due process hearing before an Impartial Hearing Officer ("IHO")." Id. (citations omitted). "An IHO's decision may, in turn, be appealed to a State Review Officer ("SRO"), who is an officer of the State's Department of Education." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 225 (2d Cir. 2012). Either party can challenge the SRO's final administrative decision by filing a civil action in federal court. M.W., 725 F.3d at 135-36.

## II.    Factual Summary

Plaintiffs allege that the DOE's educational placement for K.L. for the 2011-2012 school year denied K.L. a FAPE. (Compl. ¶ 36, ECF No. 1). As a result, Plaintiffs placed K.L. at the Manhattan Children's Center ("MCC"), a private school serving autistic children, and continued her home-based services. (See Pls.' 56.1 ¶ 38, ECF No. 22) (notifying the DOE of K.L.'s private school placement and continuation of home-based services). They now seek reimbursement for K.L.'s educational costs during the 2011-2012 school year. (See generally Compl., ECF No. 1). Notwithstanding this request for reimbursement, the DOE has paid for K.L.'s home-based services and transportation costs, as required by the Impartial Hearing Officer's Pendency Order. (Walsh Decl. Ex. C, ECF No. 20).

### A.  K.L.'s Background

K.L. was born in February 2001. (IHO Hr'g Ex. K). She has been diagnosed with autism, verbal apraxia, seizure disorder, and acute sensitivity to environmental stimuli. (Pls.' 56.1 ¶ 1, ECF No. 22). As a result, she has global developmental delays, and has exhibited behaviors such as pinching, biting, spitting, hitting, and clothes shredding, which have interfered with her learning. (Pls.' 56.1 ¶ 2, ECF No. 22; Def.'s 56.1 ¶ 6, ECF No. 29).

### B.  Committee for Special Education Meeting

On March 15, 2011, a Committee met to prepare an IEP for K.L. for the 2011-2012 school

year.  (Def.'s 56.1 ¶ 8, ECF No. 29).   Nessan O'Sullivan, a school psychologist and the District

representative at the meeting, led the Committee meeting.   (See IHO Hr'g Ex. L).   According to

Mr. O'Sullivan, in preparation for the meeting, the Committee reviewed K.L.'s prior IEPs, a

psychological evaluation, a classroom observation report, a functional behavior assessment

("FBA") conducted by the MCC, and progress reports from the MCC, the occupational therapist,

speech therapists, and home therapists.   (IHO Hr'g Tr. 74).   Additionally, the Committee heard

from many of K.L.'s teachers and therapists at the meeting, including Dr. Amy Davies-Lackey, the

educational director of the MCC; Lindsay Friedland, K.L.'s occupational therapist at the MCC;

Amy Morris, K.L.'s speech pathologist at the MCC; Lauren Katz, K.L.'s teacher at the MCC; and

Stephanie Chen, K.L.'s home therapist.   (IHO Hr'g Ex. K; IHO Hr'g Tr. 73).   B.L., K.L.'s

mother, also participated in the Committee meeting.   (IHO Hr'g Ex. K).

Following the meeting, the Committee recommended a twelve-month school year for K.L.

with placement in a special class in a specialized school.   (Def.'s 56.1 ¶ 14, ECF. No. 29).   K.L.

was to be assigned to a classroom with a ratio of 6:1:1, that is, six students, one teacher, and one

classroom paraprofessional.   (Def.'s 56.1 ¶ 14, ECF No. 29).   The Committee also recommended

several related services—five thirty-minute sessions of speech therapy per week in a 1:1 setting;

five thirty-minute sessions of occupational therapy per week in a 1:1 setting; and three

thirty-minute sessions of physical therapy per week in a 1:1 setting.   (Def.'s 56.1 ¶ 15, ECF No.

29).   Finally, the Committee recommended that K.L. be assigned a full-time 1:1 crisis

management paraprofessional to assist with her interfering behaviors, to supervise her, to help her

navigate stairs, and to supplement her instruction.   (Def.'s 56.1 ¶ 16, ECF No. 29; IHO Hr'g Tr.

93).   The Committee also offered "parent training" as part of K.L.'s educational plan.   (IHO Hr'g

Tr. 169-70; IHO Hr'g Ex. 1).   The Committee did not recommend a home-services program for

K.L., (IHO Hr'g Tr. 135-36), offer 1:1 teaching or instruction to K.L., (See IHO Hr'g Ex. 1), or suggest a specific teaching methodology be used to instruct K.L.   (IHO Hr'g Tr. 171).

During the meeting, as the Committee developed K.L.'s IEP, it discussed and dismissed various services K.L. could be offered.   For instance, the Committee discussed the possibility of placing K.L. in a 12:1:4 program, but decided it was not suitable for K.L.   (IHO Hr'g Ex. 1).   It did not recommend an accessible program for K.L. because K.L.'s crisis management paraprofessional would be able to assist her with navigating stairs.   (IHO Hr'g Tr. 161-62).   It also discussed the possibility of home-based services, but chose to offer "parent training" in lieu of it, which, as Mr. O'Sullivan testified, "would enable the parents to provide the reinforcement of skill acquisition at home" and would adequately address her needs there.   (IHO Hr'g Tr. 123-25, 169-71).

The Committee also created a Behavior Intervention Plan ("BIP") for K.L.   (IHO Hr'g Ex. 1).   Although the Committee did not conduct its own FBA of K.L. to create this BIP, the Committee relied on the MCC's "extensive" FBA completed in February 2011.   (Pls.' 56.1 ¶ 62, ECF No. 22; IHO Hr'g Tr. 139-40).   The Committee also relied on the input of K.L.'s parents, teachers, and service providers, all of whom participated in the meeting.   (IHO Hr'g Tr. 138-40; IHO Hr'g Ex. 1).   The Committee discussed the BIP as it was developed during the meeting, but did not distribute the BIP to all the members of the Committee for review after it was written. (IHO Hr'g Tr. 141-42).

### C. *Final Notice of Recommendation*

Following the Committee meeting, Plaintiffs were sent a FNR detailing the placement the DOE was offering K.L. and the related services she would receive.   (IHO Hr'g Ex. M).   This June 10, 2011, FNR offered K.L. placement "P094M @ P188M" for the 2011-12 school year,

beginning in September 2011.   (IHO Hr'g Ex. M).   It did not discuss or describe K.L.'s placement for the summer.   (See IHO Hr'g Ex. M).   Nor did Plaintiffs receive an FNR for K.L.'s summer placement.   (IHO Hr'g Tr. 803).   Nevertheless, when B.L. visited the P188M site, she was notified that K.L. would be placed at a different site "down and around the corner" for the summer.   (IHO Hr'g Tr. 810).   In fact, B.L. visited the summer site later that same week.   (IHO Hr'g Tr. 810-11).

### D. Plaintiffs' Objections

Shortly after receiving the FNR, and before B.L.'s visit to the proposed sites, Plaintiffs wrote to the Committee expressing their concerns about the adequacy of the IEP.   (IHO Hr'g Ex. O).   By letter dated June 15, 2011, Plaintiffs noted that K.L. requires a 1:1 learning environment as opposed to a 6:1:1 as recommended in the IEP; uses a Proloquo2go, a speech assistance program, to communicate, but was not offered that technology in the IEP; and suffers from a seizure disorder, but was assigned a crisis paraprofessional rather than a health paraprofessional. (IHO Hr'g Ex. O).   After B.L. visited both proposed sites, the summer site and the school year site, Plaintiffs again wrote to the Committee on June 27, 2011, rejecting K.L.'s offered placement at P094M.   (IHO Hr'g Ex. P).   "Among other things," Plaintiffs offered the following reasons for rejection of the placement:   (1) the cafeteria had "an open pail of cleaning fluids (with a mop handle sticking out), garbage cans full of food and boxes of supplies along the wall"; (2) the cafeteria was too loud for the student; (3) the halls had too many boxes and other materials in them due to renovations that the school was doing over the summer; (4) the doors, walls and classrooms had too many "paintings, writings, pictures, quotes and things hanging" which would be distracting and present a safety issue for K.L.; and (5) the school had too many flights of stairs for K.L. to climb.   (IHO Hr'g Ex. P).   Although they could have, Plaintiffs did not seek to reconvene

6

the IEP meeting or schedule a meeting to discuss the placement with the DOE.   (See IHO Hr'g Exs. M, O, P).

### E. IHO Hearing and Decision

Following K.L.'s placement at the MCC, Plaintiffs sought an impartial hearing seeking reimbursement of tuition and home-services expenses.   (IHO Hr'g Ex. A).   They filed an amended due process complaint dated July 8, 2011.   (IHO Hr'g Ex. B).   As a result, an IHO held a hearing over the course of ten days between August 2011 and January 2012.   (Walsh Decl. Ex. A, ECF No. 20).   The IHO received testimony from the following individuals:   (1)   Nessan O'Sullivan, DOE school psychologist; (2) Heather Burnett, a classroom teacher at P094M; (3) Amy Morris, K.L.'s speech therapist; (4) Susan Cruz, an Assistant Principal at P094M; (5) Dr. Amy Davies-Lackey, the educational director at the MCC; (6) Jenna Beik, K.L.'s speech therapist, (7) Lindsay Friedland, K.L.'s occupational therapist; (8) Lauren Katz, K.L.'s teacher at the MCC; (9) Stephanie Chen, K.L.'s home therapist; and (10) B.L., K.L.'s mother.   (Walsh Decl. Ex. A, ECF No. 20).   In a twenty page, double-spaced, opinion dated March 13, 2012, the IHO granted Plaintiffs' request for tuition reimbursement, noting without discussing that he did "not credit the testimony o f [sic] the DOE's witnesses with respect to the appropriateness of the [Committee's] recommended program for the Student."   (Walsh Decl. Ex. A at 10, ECF No. 20).

### F. SRO Decision

On April 16, 2012, the DOE appealed the IHO's decision to the Office of State Review. (Compl. ¶ 9, ECF No. 1).   Plaintiffs did not cross-appeal, but urged the SRO to "render additional findings regarding whether the district offered the student a FAPE."   (Walsh Decl Ex. D at 8, 13, ECF No. 20).   After conducting an independent review of the hearing record and of Plaintiffs' claimed procedural and substantive violations, the SRO issued a decision on January 11, 2013.

(Walsh Decl. Ex. D, ECF No. 20).   In a letter accompanying the decision, the SRO acknowledged that, "for circumstances outside of [her] control," the decision was issued 210 days late.   (Walsh Decl. Ex. F, ECF No. 20).

The SRO's thirty-one page, single-spaced, opinion addressed all of Plaintiffs' objections to the IEP and placement in turn.   (Walsh Decl. Ex. D, ECF No. 20).   After reviewing K.L.'s IEP, and the testimony offered in support of that IEP, the SRO concluded that the Committee's recommendation to place K.L. in a 6:1:1 special class with the services of a full-time 1:1 paraprofessional was appropriate to address K.L.'s "highly intensive management needs." (Walsh Decl. Ex. D at 15-18, ECF No. 20).   She further found that the "IEP in this case was individualized to address [K.L.'s] needs, and . . . was designed to offer the opportunity for greater than trivial advancement."   (Walsh Decl. Ex. D at 18, ECF No. 20).   She considered the testimony of both, the DOE's witnesses and Plaintiffs' witnesses, before concluding that home-based services were not required because K.L. "would continue to make progress without the home-based program."   (Walsh Decl. Ex. D at 18-19, ECF No. 20).

The SRO next addressed the special factors and interfering behaviors.   (Walsh Decl. Ex. D at 19, ECF No. 20).   She examined the MCC's FBA and the IEP and determined that, although the Committee did not conduct its own FBA, "it nonetheless properly considered the special factors related to the student's behavior that impeded her learning" and devised a plan to address K.L.'s behavioral needs.   (Walsh Decl. Ex. D at 19-22, ECF No. 20).   In fact, the SRO quoted Mr. O'Sullivan as saying that the MCC's FBA was "extensive" and noted that the IEP "reflected information about [K.L.'s] behaviors commensurate with the MCC FBA report."   (Walsh Decl. Ex. D at 21, ECF No. 20).   After studying the BIP that the Committee created, the SRO agreed that the BIP was procedurally deficient because it failed to include "baseline data about the

8

frequency, duration, and intensity" of K.L.'s behaviors.   (Walsh Decl. Ex. D at 23, ECF No. 20).

Nevertheless, she found that the IEP "identified [K.L.'s] major interfering behaviors and provided

numerous services and supports to address them," and therefore did not amount to the denial of a

FAPE.  (Walsh Decl. Ex. D at 23, ECF No. 20).   As to the Committee's failure to include a

transition plan for K.L. in her IEP, the SRO concluded that, although the IDEA does not require

the inclusion of a transition plan, the record showed that K.L. would have been offered specialized

services to help her transition to her new school, had she attended.   (Walsh Decl. Ex. D at 25, ECF

No. 20).   The SRO also addressed the IEP's failure to recommend parent counseling.[1]  (Walsh

Decl. Ex. D at 26-27, ECF No. 20).   Relying on the hearing record, she found that parent

counseling was not only discussed at the Committee meeting, it was adjudged an important

component of the IEP, and therefore did not amount to the denial of a FAPE.  (Walsh Decl. Ex. D

at 27, ECF No. 20).

     Lastly, the SRO examined Plaintiffs' objections to the assigned school.   (Walsh Decl. Ex.

D at 27, ECF No. 20).   At the outset, she noted that because Plaintiffs' rejected the DOE's

placement, the IHO should not have addressed whether the proposed placement would have

adequately implemented the IEP.   (Walsh Decl. Ex. D at 28, ECF No. 20).   Nevertheless, the

SRO addressed Plaintiffs' objections.  (Walsh Decl. Ex. D at 28, ECF No. 20).   She first noted

that "a future change in school buildings" is not legally actionable under the IDEA.   (Walsh Decl.

Ex. D at 29, ECF No. 20).   Second, while stating an IEP need not discuss educational

methodology, she discussed how the IEP nevertheless described various techniques that have been

successful in the past.   (Walsh Decl. Ex. D at 30-31, ECF No. 20).   Third, the SRO demonstrated

---

[1]  Although it appears undisputed that the IEP does not recommend parent counseling and training,
it should be noted that the IEP does, in fact, list "parent training" as a support to be provided to
K.L. under the School Environment and Service Recommendations section of K.L.'s IEP.

9

that the IHO's determination on 1:1 instruction was not supported by the hearing record.   (Walsh Decl. Ex. D at 31, ECF No. 20).   She cited testimony by the special education teacher that the occupational therapist and the speech-language therapist "push into the classroom" to supplement instruction.   (Walsh Decl. Ex. D at 31, ECF No. 20).   And she pointed to K.L.'s numerous 1:1 sessions in speech, occupational, and physical therapy each week.   (Walsh Decl. Ex. D at 31, ECF No. 20).   Fourth, she concluded that, contrary to the IHO's finding, the hearing record reflected that the school would have addressed K.L.'s self-management needs.   (Walsh Decl. Ex. D at 32, ECF No. 20).   Finally, she discussed K.L.'s ability to navigate stairs.   (Walsh Decl. Ex. D at 32-33, ECF No. 20).   The SRO concluded that the Committee discussed K.L.'s physical limitations, and addressed her need for supervision while navigating stairs by assigning a 1:1 paraprofessional to her.   (Walsh Decl. Ex. D at 32-33, ECF No. 20).

As a result, the SRO concluded that the DOE had offered K.L. a FAPE for the 2011-12 school year and reversed the IHO.   (Walsh Decl. Ex. D at 33, ECF No. 20).   She did not consider the appropriateness of the MCC or whether the equities supported Plaintiffs' claim for tuition reimbursement.   (Walsh Decl. Ex. D at 33, ECF No. 20).   Plaintiffs filed this action on January 1, 2013, challenging the SRO's decision.   (Compl., ECF No. 1).

### G. Additional Evidence

Along with their Motion for Summary Judgment, Plaintiffs submitted the deposition transcripts of three individuals in support of their motion.   (Walsh Decl. Exs. I-K, ECF No. 20). Michael Ferguson was a 1:1 crisis paraprofessional in K.L.'s proposed classroom.   (Walsh Decl. Ex. I, ECF No. 20).   Nina Burke was the teacher in K.L.'s proposed classroom.   (Walsh Decl. Ex. J, ECF No. 20).   Cullotta Moore was the classroom paraprofessional in K.L.'s proposed classroom.   (Walsh Decl. Ex. K, ECF No. 20).   Each was deposed about the functioning of the

classroom, the services offered to the students, and a student's activities in a typical day.  (See Walsh Decl. Exs. I-K, ECF No. 20).

## III.    Discussion

### A. Legal Standard

In IDEA cases, review of a final state administrative decision is usually sought through a summary judgment motion.   Summary judgment, however, "often triggers more than inquiry into possible issues of disputed fact."   Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n. 3 (2d Cir. 2005).   "[T]he Court conducts an 'independent' review of the administrative record, [and] bas[es] its decision on the 'preponderance of the evidence.'"   P.G. v. N.Y.C. Dep't of Educ., 12 Civ. 05235 (AN), 2013 WL 4055697, at *3 (S.D.N.Y. July 22, 2013).

"But such review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'"   M.H., 685 F.3d at 240.   Instead, courts are expected to give "due weight" to the administrative proceedings. Gagliardo, 489 F.3d at 113.   "[T]he district court's determination of the persuasiveness of an administrative finding must . . . be colored by an acute awareness of institutional competence and role."   M.H., 685 F.3d at 244.

In light of these considerations, the Second Circuit has stated that the district court's analysis must amount to "more than a 'clear error' [review] but less than a full de novo review." Id.   As a result, courts typically give the state administrative proceedings considerable deference, particularly when "the state hearing officers' review has been thorough and careful" and their factual determinations are "reasoned and supported by the record."   Gagliardo, 489 F.3d at 114; Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).   But different aspects of the administrative decision merit differing levels of deference.   For instance, "determinations

regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." M.H., 685 F.3d at 244. "And the district court should afford more deference when its decision is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency." Id.

It "is the final decision of the state's authorities" that deserves the most deference. A.C. ex rel M.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009). Therefore, if "the SRO's decision conflicts with the decision of the IHO, the IHO's decision may be afforded diminished weight." Id. "The party appealing an SRO's determination bears the burden of proof in establishing that the SRO's decision is not entitled to deference." E.H. v. N.Y.C. Dep't of Educ., 12-cv-6639 (GBD), 2014 WL 1224417, at *3 (S.D.N.Y. Mar. 21, 2014).

## B. The SRO's Decision is Entitled to Deference

Here, Plaintiffs have appealed the SRO's determination, and must establish that the SRO's determination is not entitled to deference. But they have not done so. After conducting an exhaustive review of the administrative record, the SRO concluded that the Committee designed an appropriate IEP for K.L. In conjunction with the DOE's public school placement offer to her, it conformed to the procedural requirements of the IDEA, was reasonably calculated to enable her to receive educational benefits, and provided her a FAPE.

Plaintiffs argue that the SRO's decision was flawed because the SRO "(a) improperly ignored the severity of K.L.'s needs; (b) failed to properly enforce unequivocal statutory mandates and protections that K.L. and her parents were entitled to; (c) ignored the "cumulative" effect of defendant's multiple FAPE violations; (d) improperly relied on retrospective evidence; (e) cherry-picked over evidence instead of "grappling" with contrary evidence; and (f) ignored K.L.'s

12

needs for full-time 1:1 instruction."  (Pls.' Mot. Summ. J. 13, ECF No. 21).   They urge the Court to give greater weight to the IHO's determination.

But a careful examination of the SRO's decision reveals otherwise.   The SRO's decision was thorough and well-reasoned.   It included a review of K.L.'s performance levels, the underlying data used at the March 15, 2011 Committee meeting, and the ways that the Committee addressed K.L.'s needs.   Moreover, the SRO conducted an issue by issue analysis before coming to a decision.   The SRO addressed contrary evidence, crediting the testimony of Plaintiffs' witnesses in several instances, but ultimately determining that the DOE's educational plan was sufficient to offer K.L. a FAPE.   She did not improperly rely on "retrospective evidence"; she relied on evidence that expounded upon the decisions reflected in K.L.'s IEP, as she was entitled to do under Second Circuit precedent.   See R.E., 694 F.3d at 185-89.   And she did not "ignore" the cumulative effect of the DOE's procedural violations.   Rather, she explained why each procedural violation, separately, and together, did not amount to the denial of a FAPE to K.L.

Although the additional evidence Plaintiffs put forth in their summary judgment motion would normally entitle the SRO's decision to less deference, it does not do so in this case. Plaintiffs' additional evidence—depositions of the teacher and paraprofessionals who would have taught K.L. had she accepted the DOE's placement—deals with the adequacy of the specific class proposed by the DOE.   Under Second Circuit precedent, "courts are prohibited from evaluating the adequacy of an unimplemented IEP based on evidence about the particular classroom in which a student would be placed."   N.K. v. N.Y.C. Dep't of Educ., 961 F. Supp. 2d 577, 590 (S.D.N.Y. 2013).   Accordingly, the Court will not consider this evidence, and will give the SRO's opinion its due deference.

### C. The DOE provided K.L. with a FAPE

The Burlington/Carter test requires a board of education to pay for the program selected by a parent only if:   (1) the educational program recommended by the board of education was inadequate or inappropriate; (2) the program selected by the parent was appropriate, such that the private program meets the student's special education needs; and (3) the equities support the parent's claim.   Carter, 510 U.S. at 12-13; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-72 (1985).   Under the first prong, the Court reviews the procedural and substantive adequacy of the IEP.   Walczak, 142 F.3d at 129 (citations omitted).   Specifically, the Court examines whether the student's IEP was developed according to the IDEA's procedural requirements, and whether the IEP was reasonably calculated to confer educational benefit on the student.   Id.   Only if Plaintiff proves that the IEP confers no educational benefit will this Court need to consider the other Burlington factors.   M.C. v. Voluntown Bd. Of Educ., 226 F.3d 60, 66 (2d Cir. 2000).

### 1.   The DOE complied with the procedural requirements of the IDEA

Plaintiffs allege that K.L.'s IEP contained three procedural deficiencies, each of which denied her a FAPE.   Specifically, they argue that K.L.'s IEP was procedurally inadequate because:   (1) the IEP did not provide for parent training or counseling; (2) the DOE did not conduct its own FBA; and (3) the FNR did not identify a summer location for K.L.   (Pls.' Mot. Summ. J. 22-25, ECF No. 21).   Additionally, Plaintiffs argue that even if no single procedural violation denied K.L. a FAPE, when considered cumulatively, the procedural violations had that result.   (Pls.' Mot. Summ. J. 22-25, ECF No. 21).

To determine whether an alleged procedural violation in a child's IEP denied the child a FAPE, the Court must first examine if the DOE deviated from the IDEA's procedural

requirements.   Under the statute, however, not every violation of these procedural requirements amounts to the denial of a FAPE.   Rather, a procedural violation only results in the denial of a FAPE if it:   "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits."   20 U.S.C. § 1415(f)(3)(E)(ii).   The Court examines each alleged procedural violation in turn, and then cumulatively.

> a.   *The failure to provide for parent training and counseling in the IEP did not deny K.L. a FAPE*

Plaintiffs argue that K.L.'s IEP was procedurally deficient because it did not provide for individualized parent training and counseling.   (Pls.' Mot. Summ. J. 24, ECF No. 21).   Under New York regulations, the failure to include parent training and counseling in an IEP is a procedural violation.   8 NYCRR § 200.13(d).   It cannot be remedied by retrospective testimony—testimony offered when the IEP is challenged—suggesting that the school district would have provided parent counseling and training.   R.E., 694 F.3d at 174, 185-86. Nevertheless, an SRO's reliance on retrospective testimony does not render its conclusion regarding the IEP's procedural adequacy incorrect.   The Second Circuit has held that the "failure to provide [parent] counseling ordinarily does not result in a FAPE denial or warrant tuition reimbursement."   M.W., 725 F.3d at 142.   This is especially so when the parents have "received extensive parent training in the past and have been actively involved in their child's education, communicating regularly with teachers and service providers."   M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ., 583 F. Supp. 2d 498, 509 (S.D.N.Y. 2008).

It should first be noted that the IEP does, in fact, list parent counseling as a related service

on K.L.'s IEP.   (IHO Hr'g Ex. 1).   Moreover, Mr. O'Sullivan testified that the parent training

component was discussed at the Committee meeting, which B.L. attended.   (IHO Hr'g Tr. 114).

Lastly, B.L. herself admitted that she is actively involved in her daughter's education.   (IHO Hr'g

Tr. 818).   Thus, the Committee's failure to include a detailed plan for parent training in the IEP

does not amount to a procedural violation, and the Court defers to the SRO's determination that the

omission of such details of parent counseling and training from K.L.'s IEP did not result in the

denial of a FAPE.   (Walsh Decl. Ex. D at 25, ECF No. 20).

*b.   The failure to conduct an FBA did not deny K.L. a FAPE*

Plaintiffs next argue that K.L.'s IEP was procedurally deficient because the Committee did

not conduct an FBA before it developed K.L.'s BIP.   (Pls.' Mot. Summ. J. 22-23, ECF No. 21).

The IDEA requires that a school district developing an IEP for "a child whose behavior impedes"

his learning must "consider the use of positive behavioral interventions and supports, and other

strategies, to address that behavior."   20 U.S.C. § 1414(d)(3)(B)(i).   To facilitate this, New York

regulations require that a Committee conduct an FBA—an evaluative document that includes "the

identification of the contextual factors that contribute to the behavior . . . and the formulation of a

hypothesis regarding the general conditions under which a behavior usually occurs and probable

consequences that serve to maintain it."   8 N.Y.C.R.R. § 200.1(r).   The failure to conduct an

FBA does not automatically constitute denial of a FAPE—when an IEP adequately addresses a

child's interfering behaviors, the procedural requirements of the IDEA are satisfied.   A.C., 553

F.3d at 172.

Here, the IEP adequately addresses K.L.'s interfering behaviors.   The Committee relied

on a February 2011 FBA that the MCC conducted on K.L.   (IHO Hr'g Tr. 74).   In fact, Mr.

O'Sullivan testified that it was one of the "more extensive" FBAs he has reviewed.   (IHO Hr'g Tr.

16

139-40).   The Committee even developed a BIP based on that FBA.   (IHO Hr'g Ex. 1).   And the IEP reflects the data the Committee gleaned from the MCC's FBA.   (IHO Hr'g Exs. 1, 3).   It not only listed K.L.'s interfering behaviors on her IEP, but also included many of the strategies and goals that the MCC used to address those behaviors.   (IHO Hr'g Exs. 1, 3).   Thus, although this was a procedural violation, the Court defers to the SRO's determination that MCC's FBA was sufficient to aid in the development of K.L.'s IEP and did not result in the denial of a FAPE. (Walsh Decl. Ex. D at 21, ECF No. 20).

> ### c.   *The FNR's failure to identify a summer location did not deny K.L. a FAPE*

Finally, Plaintiffs argue that the DOE did not provide them an FNR for the summer site, and that failure led to the denial of a FAPE for K.L.   (Pls.' Mot. Summ. J. 25, ECF No. 21). Plaintiffs admit that the DOE sent them an FNR for the school year beginning in September 2011. (IHO Hr'g Tr. 802-03; IHO Hr'g Ex. M).   While the DOE's failure to notify the parents of a summer site for their daughter via an FNR could be problematic, the Court need not reach that argument.   When B.L. visited the site that the FNR directed her to, she was notified that K.L. would be attending her six-week summer session at a location just around the corner.   (IHO Hr'g Tr. 803, 810-11).   Moreover, B.L. even visited that location.   (IHO Hr'g Tr. 810-11).   It could not, then, have "significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a [FAPE] to their child."   20 U.S.C. § 1415(f)(3)(E)(ii).   Therefore, the DOE's failure to provide an FNR for the summer location did not amount to the denial of a FAPE to K.L.

> ### d.   *Cumulatively, the DOE's procedural violations did not deny K.L. a FAPE*

Even if no singular procedural violation in an IEP considered alone denies the student a FAPE, such violations may result in the denial of a FAPE when considered cumulatively.   R.E.,

694 F.3d at 190 ("[E]ven minor violations may cumulatively result in a denial of a FAPE."). The Court, however, has concluded that only one of the three alleged violations was in fact a procedural violation.   That violation—the failure to conduct an FBA—then, can have no cumulative effect.   R.B. v. N.Y.C. Dep't of Educ., 12 Civ. 3763 (AJN), 2013 WL 5438605, at *12; cf. R.E., 694 F.3d at 192–196 (analyzing the cumulative effect of the determined, rather than alleged, procedural violations in three IDEA cases).   And, as addressed above, the Second Circuit has held that this failure does not rise to the level of a denial of a FAPE.   A.C., 553 F.3d at 172. Thus, the Court concludes that, whether considered individually or cumulatively, the alleged procedural violations did not deny K.L. a FAPE.

### 2.  K.L.'s March 2011 IEP was substantively adequate

Plaintiffs also claim that K.L.'s IEP was substantively inadequate for four reasons:   (1) the DOE recommended a 6:1:1 classroom for K.L. as opposed to the 1:1 instruction she needed; (2) the DOE failed to include a transition plan for K.L. in her IEP; (3) the DOE failed to offer home and community services to K.L.; and (4) the DOE's recommended placement sites were inappropriate for K.L.   (Pls.' Mot. Summ. J. 16-18, 24-28, ECF No. 21).

An IEP is substantively adequate if it is "reasonably calculated to enable [a] child to receive educational benefits."   Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 190 (2005) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)).   In the Second Circuit, an IEP is substantively adequate if it is "'likely to produce progress, not regression' and 'affords the student . . . an opportunity greater than mere trial advancement.'"   E.S. ex rel. B.S. v. Katonah Lewisboro Sch. Dist., 487 F. App'x 619, 621 (2d Cir. 2012) (quoting Cerra, 427 F.3d at 195).   But a school district is not required to furnish "every special service necessary to maximize each handicapped child's potential," Rowley, 458 U.S. at 199, or "everything that might be thought desirable by

loving parents." <u>Walczak</u>, 142 F.3d at 132 (internal quotation marks and citations omitted).

Any substantive inadequacy in a student's IEP denies the student a FAPE. <u>See</u> <u>M.W.</u>, 725 F.3d at

131 (2d Cir. 2013) (quoting <u>R .E.</u>, 694 F.3d at 190).   For the reasons discussed below, the Court

agrees with the SRO's conclusion that K.L.'s IEP was substantively adequate.

> a. *The Committee's recommendation for a 6:1:1 placement for K.L. was appropriate*

Plaintiffs argue that K.L. needs a 1:1 teaching environment for her to learn.   (Pls.' Mot.

Summ. J. 16, ECF No. 21).   Anything other than that "would result in regression for K.L."   (Pls.'

Mot. Summ. J. 16, ECF No. 21).   In this case, after carefully reviewing the evaluative materials

before it, the Committee recommended that K.L. be assigned to a special classroom with a 6:1:1

ratio and be paired with an individual crisis paraprofessional, and drafted a detailed plan of the

goals and strategies to address her needs.   (IHO Hr'g Ex. 1).   K.L.'s classroom program was

specially picked because it was designed for students with autism who exhibited significantly

delayed speech-language skills and behavioral difficulties, as K.L. did here.   (IHO Hr'g Tr. 112).

In addition, the Committeee recommended detailed academic management strategies, and related

services of five individual sessions of speech-language therapy per week, five individual sessions

of occupational therapy per week, and three individual sessions of physical therapy per week.

(IHO Hr'g Ex. 1).

It is not disputed that Plaintiffs' witnesses recommended a 1:1 program for K.L.   (Pls.'

Mot. Summ. J. 16, ECF No. 21).   But the Committee is not required to adopt every

recommendation Plaintiffs' witnesses make.   <u>See</u> <u>Watson v. Kinston City Sch. Dist.</u>, 142 F.

App'x 9, 10 (2d Cir. 2005); <u>B.O. v. Cold Spring Harbor Cent. Sch. Dist.</u>, 807 F. Supp. 2d 130, 139

(E.D.N.Y. 2011).   And Plaintiffs' experts did not suggest that K.L. would not learn, or would

regress, with less than 1:1 instruction.   (See Pls.' Mot. Summ. J. 16, ECF No. 21).

The SRO combed through the record, and correctly determined that K.L. would have had a meaningful opportunity to advance under the Committee's education plan.   (Walsh Decl. Ex. D at 13-15, ECF No. 20).   After considering the testimony of Plaintiffs' witnesses as well as their recommendations, the SRO concluded that the differences "amount[] to conflicting viewpoints among educators over the best manner in which to deliver special education instruction and services to a student."   (Walsh Decl. Ex. D at 31, ECF No. 20).   See D.J. v. N.Y.C. Dep't of Educ., No. 12 Civ. 7009, 2013 U.S. Dist. Lexis 115666, at *14-16 (S.D.N.Y. Aug. 15, 2013) ("[C]lass size and student-teacher ratios involve questions of methodology more appropriately answered by the state and district decision-makers than by federal judges.").   Moreover , the Court notes that a 6:1:1 classroom environment is defined by state regulations as one for "students whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention."   8 N.Y.C.R.R. § 200.6(h)(4)(ii)(a).   The Court finds that the SRO's decision is supported by the facts.   Therefore, the Court defers to the thorough and well-reasoned determination of the SRO.

### b. The Committee's failure to include a transition plan did not render the IEP substantively inadequate

Plaintiffs next allege that because a transition plan was not included for K.L. in her IEP, her IEP is substantively inadequate.   (Pls.' Mot. Summ. J. 24-25, ECF No. 21).   Plaintiffs argue that the SRO improperly relied on retrospective testimony when she concluded that "the district would . . . have offered the student specialized services to assist her transfer from MCC to the district . . . ."   (Walsh Decl. Ex. D at 23).   Plaintiffs are correct.   The retrospective testimony offered by the DOE does not cure a substantive inadequacy.   However, in the Second Circuit, the failure to

20

include a transition plan does not amount to a substantive violation.   R.E., 694 F.3d at 195.

Therefore, the lack of a transition plan in K.L.'s IEP does not render it substantively inadequate.

> c.   *The Committee's failure to recommend home-based services did not deny K.L. a FAPE*

Plaintiffs also argue that K.L.'s home based program was necessary for her to make

"meaningful progress."   (Pls.' Mot. Summ. J. 25, ECF No. 21).   But the record does not support

their contention.   In fact, both the coordinator and the supervisor of K.L.'s home based program

stated that she would make progress without the home-based program, even if not at the same rate.

(IHO Hr'g Tr. 594-95, 768-69).   Also, the evidence demonstrates that the Committee considered

continuing the home-based program K.L. had, but concluded that it was not a necessary

component of her educational plan.   (IHO Hr'g Tr. at 114).   The SRO noted these considerations

in her opinion when she agreed with the Committee's decision.   (Walsh Decl. Ex. D at 17, ECF

No. 20).   Therefore the Court will defer to the SRO's determination on this matter of educational

policy.

> d.   *There is insufficient evidence to conclude that the specific school recommended by the DOE would have denied K.L. a FAPE*

Finally, Plaintiffs argue that the two school sites to which Plaintiff was assigned were

inadequate.   (Pls.' Mot. Summ. J. 26-32, ECF No. 20).   Plaintiffs raise several issues about these

sites.   First, Plaintiffs contend that the school would have been unable to meet K.L.'s puberty

education goals.   (Pls.' Mot. Summ. J. 26-32, ECF No. 20).   Second, Plaintiffs object to the

school's failure to employ the methodologies with which K.L. has been instructed in private

school.   (Pls.' Mot. Summ. J. 26-32, ECF No. 20).   Third, Plaintiffs assert that the lack of

elevators in the schools was problematic for K.L.   (Pls.' Mot. Summ. J. 26-32, ECF No. 20).

Fourth, Plaintiffs attack the training of the DOE's purported teacher for K.L.   (Pls.' Mot. Summ. J. 26-32, ECF No. 20).

At the outset, the Court notes that under Second Circuit precedent, "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." R.E., 694 F.3d at 195.   Nevertheless, the Court notes that Plaintiffs' objections do not demonstrate the denial of a FAPE.

Insofar as K.L.'s puberty education goals are concerned, the record does not support Plaintiffs' claim.   To the contrary, the record shows that the classroom teacher would have addressed those goals in a private part of the classroom.   (IHO Hr'g Tr. 282-84).   The Plaintiffs also fault the schools for not having elevators.   However, the record amply supports the Committee and the SRO's finding that K.L. did not require an elevator, but simply supervision when navigating stairs.   In fact, K.L. was required to use the stairs at her private school, the MCC. (IHO Hr'g Tr. 743, 747-48).   The Committee adequately addressed K.L.'s need for supervision by assigning a full-time 1:1 crisis paraprofessional to her.   (IHO Hr'g Tr. 93).

Next, Plaintiffs express concern over the school's failure to employ the methodologies with which K.L. has been taught in the past.   But they do not cite to any evidence in the record that demonstrates that K.L. would not be responsive to a different methodology.   Moreover, decisions about educational methodology are afforded considerable deference.   Finally, Plaintiffs' argue that the proposed teachers did not have training in the methodologies and programs that K.L. used. Not only is this impermissible class-specific testimony, N.K., 961 F. Supp. 2d at 590, but also Plaintiffs have not shown that the teachers were unwilling or unable to learn, for instance, Proloquo2go, the iPad program that K.L. sometimes uses to communicate.   Id. at 592.   As a result, the placement sites' failure to employ a particular methodology or the teachers' lack of

training in a particular methodology does not amount to the denial of a FAPE.

Therefore, the Court concludes that the SRO's determinations regarding the substantive adequacy of K.L.'s IEP were well supported by the record and are entitled to the full degree of deference.    Accordingly, the Court agrees with the SRO that K.L.'s IEP was substantively adequate.

## IV.    SRO's Delayed Decision

Although the Court agrees with Plaintiffs that the State Review Office's routine delays in issuing decisions is problematic, it has found no authority in IDEA cases that allows it to "declare the SRO's decision a nullity."  (Pls.' Reply Br. 1, ECF No. 31).

## V.    Conclusion

From all indications, K.L. is an engaging, hardworking, and deserving young girl.    She has dedicated parents who have invested substantial time, money, and effort into K.L.'s growth and development.    The Court regrets this difficult decision.    Unfortunately, the Court is bound by the law.    For the reasons set forth above, the Court concludes that K.L.'s 2011-2012 IEP was procedurally and substantively adequate.    Therefore, the DOE's motion is GRANTED, (ECF No. 27), and Plaintiffs' motion is DENIED.   (ECF No. 18).


**SO ORDERED.**


**Dated:**    March 31, 2014

       **New York, New York**

                                    **ANDREW L. CARTER, JR.**
                                      **United States District Judge**